# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-09-00425-CV
---

### SWEPI LP, Appellant

### v.

### Railroad Commission of Texas and Hidalgo County, Appellees

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-06-003322, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**
---

### O P I N I O N

SWEPI LP appeals from the district court's judgment affirming final orders of appellee the Railroad Commission of Texas and granting the Commission's plea to the jurisdiction on SWEPI's declaratory claims.[1] In its final orders, the Commission approved two applications for "qualified subdivisions" pursuant to chapter 92 of the natural resources code and the Commission's companion rule 76. *See* Tex. Nat. Res. Code Ann. §§ 92.001-.007 (West 2001) ("chapter 92"); 16 Tex. Admin. Code § 3.76 (2009) (Tex. R.R. Comm'n, Commission Approval of Plats for Mineral Development) ("rule 76"). Because we conclude that the district court did not err in affirming the Commission's final orders and granting its plea to the jurisdiction, we affirm the district court's judgment.

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008) (Texas Uniform Declaratory Judgments Act) (the "Act"); Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2008 & Supp. 2009) (Texas Administrative Procedure Act) (the "APA").

BACKGROUND

*Chapter 92 and Rule 76*

We begin by providing a brief overview of the relevant statutory scheme and common law to give context to the parties' arguments. Under the common law, the mineral estate is dominant, and a mineral estate owner's right to develop includes an implied right to use the surface estate in ways reasonably necessary to carry out its operations as long as the operations are consistent with the common law requirement to reasonably accommodate the current uses of the surface. *See Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971); *Texas Genco, LP v. Valence Operating Co.*, 187 S.W.3d 118, 121-22 (Tex. App.—Waco 2006, pet. denied) (discussion of "accommodation doctrine"); *Davis v. Devon Energy Prod. Co.*, 136 S.W.3d 419, 423-24 (Tex. App.—Amarillo 2004, no pet.) (discussion of common law balance between the mineral and surface estates of the use of the surface and the accommodation doctrine).

In 1983, the Texas Legislature enacted chapter 92. *See* Tex. Nat. Res. Code Ann. §§ 92.001-.007 ("Mineral Use of Subdivided Land"). Chapter 92 provides a statutorily granted exception to the common law. It provides a procedure for owners of surface estates to limit mineral estate owners' use of the surface based upon the surface's future development, delegating administration of the procedure to the Commission. *See id*. § 92.004. The commission has jurisdiction over oil and gas wells in Texas and persons owning or engaged in drilling or operating oil and gas wells in Texas. *See id*. § 81.051 (West 2001) ("Jurisdiction of Commission").

Section 92.003 provides that "surface owners of a parcel of land may create a qualified subdivision on the land if a plat of the subdivision has been approved by the railroad

commission and filed with the clerk of the county in which the subdivision is to be located." *See id*.

§ 92.003. Section 92.002(3) defines a "qualified subdivision" as follows:

> (3)   "Qualified subdivision" means a tract of land of not more than 640 acres:
>
> (A)   that is located in a county having a population in excess of 400,000, or in a county having a population in excess of 140,000 that borders a county having a population in excess of 400,000 or located on a barrier island;
>
> (B)   that has been subdivided in a manner authorized by law by the surface owners for residential, commercial, or industrial use; and
>
> (C)   that contains an operations site for each separate 80 acres within the 640-acre tract and provisions for road and pipeline easements to allow use of the operations site.

*Id*. § 92.002(3).

Within an approved qualified subdivision, the mineral estate owner's use of the surface is limited to "designated operations sites for exploration, development, and production of minerals and the designated easements only as necessary to adequately use the operations sites." *Id*. § 92.005. "'Operations site' means a surface area of two or more acres located in whole or in part within a qualified subdivision, designated on the subdivision plat, that an owner of a possessory mineral interest may use to explore for and produce minerals." *Id*. § 92.002(1).[2] An application to create a qualified subdivision "must be accompanied by a plat of the subdivision showing the applicant's proposed location of operations sites and road and pipeline easements." *Id.* § 92.004(a).

---

[2] "'Possessory mineral interest' means a mineral interest that includes the right to use the land surface for exploration and production of minerals." Tex. Nat. Res. Code Ann. § 92.002(2) (West 2001).

3

After notice to the applicant and owners of possessory mineral interests, the Commission must hold a hearing on the application to "consider the adequacy of the number and location of operations sites and road and pipeline easements." *See id*. § 92.004(b). "After considering the evidence, the commission shall approve, reject, or amend the application to ensure that the mineral resources of the subdivision are fully and effectively exploited." *Id*. An applicant or owner of a possessory mineral interest may appeal the Commission's order "as provided by law." *Id*.; *see also* Tex. Gov't Code Ann. § 2001.171 (West 2008) (judicial review of state agency decisions).

The Commission adopted rule 76 to implement chapter 92. *See* 16 Tex. Admin. Code § 3.76; *see also* Tex. Nat. Res. Code Ann. § 92.004(a) (commission charged with adopting rules). The subsections of rule 76 at issue substantively track the language in the corresponding sections in chapter 92. With this context, we turn to the parties' dispute.

*The Controversy*

In 2004, Betty Eyhorn acquired the surface estate of 1,280 contiguous acres of dry farm land in Hidalgo County. Boston Texas Land and Trust owns the mineral estate of the 1,280 acres, and SWEPI is the owner and operator of an oil and gas lease with Boston Texas Land and Trust that encompassed this acreage. SWEPI has operational wells producing gas on portions of the acreage.

4

In 2006, Eyhorn recorded plats in the real property records of Hidalgo County[3] and filed two applications accompanied by the recorded plats with the Commission for "qualified subdivisions" of 640 acres each on her land. *See* Tex. Nat. Res. Code Ann. §§ 92.002(3), .004; 16 Tex. Admin. Code § 3.76(a)(4), (c). The plats show proposed locations for oil and gas operations sites and road and pipeline easements. *See* Tex. Nat. Res. Code Ann. § 92.004(a); 16 Tex. Admin. Code § 3.76(c)(4). At that time, Hidalgo County had an option to purchase the 1,280 acres from Eyhorn and planned to use the acreage for constructing and operating a landfill. The Commission notified SWEPI as an owner of possessory mineral interests, and SWEPI opposed approval of both applications. *See* Tex. Nat. Res. Code Ann. § 92.004(b); 16 Tex. Admin. Code § 3.76(d). The two applications were considered in consolidated hearings.[4]

In September 2006, SWEPI filed this cause, requesting that the district court enjoin the Commission from holding the hearings because the Commission did not have authority to approve the applications. After a hearing, the district court denied SWEPI's request and abated this cause until the Commission entered its final orders.[5]

---

[3] The subdivision plats bear the signature of the county judge and attestation by the county clerk that the Hidalgo County Commissioner's Court reviewed and approved the plats for the two subdivisions in February 2006.

[4] In September 2006, Eyhorn provided SWEPI and the Commission with revised plats for both subdivisions and advised them that the revised plats would be the basis for Eyhorn's case at the consolidated hearings. Among the revisions, these plats increased the size of the proposed oil and gas operations sites. The revised plats designate approximately 140 acres and 139 acres for oil and gas operations sites in the two subdivisions respectively.

[5] SWEPI filed an accelerated appeal from the district court's denial of its request for injunctive relief with this Court, but it was dismissed for want of prosecution in June 2007. *SWEPI LP v. Railroad Commission*, No. 03-06-00599-CV (Tex. App.—Austin June 18, 2007) (mem. op.), *available at* http://www.3rdcoa.courts.state.tx.us/opinions/Opinion.asp?OpinionID=15959.

5

The consolidated hearings were resumed and heard on January 21 and February 22, 2007.[6] The hearing examiners issued a proposal for decision on November 1, 2007, recommending approval of both applications. The evidence was then reopened in January 2008 to receive evidence of a new well that SWEPI drilled after the proposal for decision was issued. The new well was at a surface location outside of the proposed operations sites on one of the subdivisions. Eyhorn provided a revised plat for that subdivision which was admitted into the record. The revised plat provided an additional operations site around the location of the new well.

The hearing examiners thereafter issued an amended proposal for decision, addressing the new well and continuing to recommend approval of both applications. In February 2008, the Commission adopted and incorporated the examiners' conclusions of law and relevant findings of fact and entered separate final orders approving the two applications. The final order for each qualified subdivision attached and incorporated a metes and bounds description of the subdivision and the revised plat depicting the location of the oil and gas operations sites and easements. SWEPI filed a motion for rehearing on both applications, which motions the Commission overruled.

In May 2008, SWEPI filed an amended petition in this cause, seeking judicial review of the Commission's final orders under the Texas Administrative Procedure Act. *See* Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2008 & Supp. 2009) (the "APA"). SWEPI also sought declarations that the Commission's final orders were in excess of the Commission's statutory authority and interfered with and impaired a legal right or privilege of SWEPI or, in the alternative,

---

[6] Prior to the hearing in January 2007, Hidalgo County amended its subdivision rules to address qualified subdivisions for purposes of chapter 92. Although SWEPI challenged the amendments in the district court, SWEPI does not challenge them on appeal.

declarations construing SWEPI's rights under the Commission's final orders. *See id*. § 2001.038 (West 2008); Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008) (Texas Uniform Declaratory Judgments Act) (the "Act"). After Eyhorn sold her land to Hidalgo County, Hidalgo County intervened and Eyhorn withdrew as a party to this cause.

In March 2009, the Commission filed a plea to the jurisdiction on SWEPI's claims for declaratory relief and, in April 2009, the district court held a hearing on the administrative appeal and the Commission's plea to the jurisdiction. Following the hearing, the district court affirmed the Commission's final orders and granted its plea to the jurisdiction. This appeal followed.

## ANALYSIS

In five issues, SWEPI contends that the district court erred by affirming the Commission's final orders and by granting the Commission's plea to the jurisdiction. SWEPI urges that the Commission exceeded its statutory authority because chapter 92's plain language does not authorize the Commission to consider or approve two contiguous 640-acre qualified subdivisions on a single parcel of land for the single purpose of landfill operations. As to its declaratory claims, SWEPI contends that the district court had jurisdiction to interpret chapter 92 and rule 76 or, in the alternative, to declare SWEPI's rights under the Commission's final orders.

### *Administrative Appeal of Commission's Final Orders*

In its first three issues, SWEPI challenges the Commission's final orders under the APA. SWEPI urges that the Commission acted outside of its authority by approving Eyhorn's applications of two contiguous 640 acres for the "same development on a single parcel of land."

7

SWEPI also urges that the Commission acted outside its authority by approving the subdivisions because they "had not been subdivided for 'residential, commercial or industrial use'" but for Hidalgo County to construct and operate a landfill. SWEPI further urges that the Commission improperly interpreted and applied rule 76 in a manner that interferes with or impairs a legal right or privilege of SWEPI.

### A)  Scope and Standard of Review

We may reverse a state administrative agency's decision that prejudices substantial rights of the complaining party if the decision is in violation of a constitutional or statutory provision, in excess of the agency's authority, made through unlawful procedure or affected by other error of law, not reasonably supported by substantial evidence, or arbitrary or capricious or characterized by an abuse of discretion. Tex. Gov't Code Ann. § 2001.174(2)(A)-(F) (West 2008); *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792-93 (Tex. 1995). SWEPI limits its challenge to the Commission's authority to consider and approve the final orders. *See id.* § 2001.174(2)(B).

An administrative agency "has only those powers that the Legislature expressly confers upon it" and "any implied powers that are reasonably necessary to carry out the express responsibilities given to it by the Legislature." *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 315 (Tex. 2001). The issue then is the scope of the Commission's authority under chapter 92, and the starting point for construing chapter 92 is the language of the statute itself. *See In re City of Georgetown*, 53 S.W.3d 328, 331 (Tex. 2001).

8

We consider questions of statutory construction *de novo*. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). When construing a statute, our primary goal is to determine and give effect to the legislature's intent. *Id.*; *see also* Tex. Gov't Code Ann. § 312.005 (West 2005). To determine legislative intent, we look to the statute as a whole, as opposed to isolated provisions. *City of San Antonio*, 111 S.W.3d at 25 (citing *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002)). We begin with the plain language of the statute at issue and apply its common meaning. *Id.* Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language unless that construction would lead to an absurd result. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999).

We construe administrative rules in the same manner as statutes. *See Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). Unless the rule is ambiguous, we follow the rule's plain language, and our primary objective is to give effect to the agency's intent. *See id.* For this reason, we give deference to an agency's interpretation of its own rules unless that interpretation is clearly erroneous or contrary to the plain language of the rule. *See Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Cities of Dickinson v. Public Util. Comm'n*, 284 S.W.3d 449, 453 (Tex. App.—Austin 2009, no pet.).

### B) *640-acre Limit for a Qualified Subdivision*

In its first two issues, SWEPI contends that the Commission exceeded its statutory authority under chapter 92 and improperly interpreted and applied rule 76 by approving two contiguous qualified subdivisions that are in excess of 640 acres combined on a single parcel of land. SWEPI urges that the plain meaning of "not more than 640 acres" in the definition of

9

"qualified subdivision" in section 92.002(3) and rule 76(a)(4) is as a statutory cap or "absolute limit" on the amount of acres that can be approved as a qualified subdivision on a single parcel of land. *See* Tex. Nat. Res. Code § 92.002(3); 16 Tex. Admin. Code § 3.76(a)(4). SWEPI focuses on the use of the indefinite article "a" in the definition of "qualified subdivision" in the statute and the rule—"*a* tract of land of not more than 640 acres"—and in the phrase in section 92.003 that "[t]he surface owners of *a* parcel of land may create *a* qualified subdivision on the land . . . ." *See* Tex. Nat. Res. Code Ann. §§ 92.002(3), .003; 16 Tex. Admin. Code § 3.76(a)(4) (emphasis added).[7] Based upon the use of "a" in the phrases "a tract of land of not more than 640 acres," "a parcel of land," and "a qualified subdivision," SWEPI contends that the plain meaning of this language only supports a single 640-acre qualified subdivision per parcel of land. SWEPI argues that to construe chapter 92 and rule 76 to authorize the Commission to approve multiple applications for contiguous qualified subdivisions on a single piece of property, as long as no single application exceeds 640 acres, would give no meaning to the inclusion of "no more than 640 acres." *See City of San Antonio*, 111 S.W.3d at 29 (effect must be given to each word and clause so that none are rendered meaningless); *see also* Tex. Gov't Code Ann. § 311.021(2) (West 2005) ("[T]he entire statute is intended to be effective.").

The Commission's interpretation of chapter 92 and rule 76, however, conforms with the common meaning of the language in both the statute and rule. In drafting statutes, the singular tense includes the plural and the plural tense includes the singular "unless expressly provided

[7] Section 92.003 addresses who may create a qualified subdivision, limiting creation of a subdivision to "the surface owners of a tract of land." *See* Tex. Nat. Res. Code Ann. § 92.003 (West 2001).

otherwise." Tex. Gov't Code Ann. § 312.003(b) (West 2005); *see id*. § 311.012(b) (West 2005) ("The singular includes the plural and the plural includes the singular."); *Frenship Rural High Sch. Dist. v. Central Educ. Agency*, 404 S.W.2d 41, 43-44 (Tex. Civ. App.—Austin 1966, writ ref'd n.r.e.) (discussing and applying rule that singular includes plural). Here, the legislature did not provide otherwise.

Although the legislature limited a qualified subdivision to "a tract of land of not more than 640 acres," the legislature did not expressly provide that only one 640-acre qualified subdivision was authorized for a landowner of more than 640 acres. Nor did the legislature expressly require the Commission to consider applications for qualified subdivisions based upon their relation to other proposed subdivisions, such as joint proposed development and relative locations. "Only when it is necessary to give effect to the clear legislative intent can we insert additional words or requirements into a statutory provision." *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981); *see City of Rockwall v. Hughes*, 246 S.W.3d 621, 629 (Tex. 2008) (declining to read additional words into statute in construing statute).

In contrast to the Commission's interpretation, SWEPI's proposed interpretation would require this Court to add additional requirements to the statute that are not contained in its plain language. *See Cameron*, 618 S.W.2d at 540. We would have to add requirements that would limit a landowner of more than 640 acres to one qualified subdivision on her land even if she planned to develop her entire tract for the same purpose. If the legislature had intended to place such restrictions on qualified subdivisions, it could have written such restrictions into the statute. *See id.; see also Presidio Indep. Sch. Dist. v. Scott*, No. 08-0958, slip op. at 7 (Tex. April 23, 2010),

11

*available at* http://www.supreme.courts.state.tx.us/historical/2010/apr/080958.pdf ("Courts must not give the words used by the Legislature an 'exaggerated, forced, or constrained meaning.'" (quoting *City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002)). Likewise, if the legislature had intended to effect a cap, it would likely have said so. We may not presume that when the legislature chooses, it opts for opacity. The purpose of the law shall not be sacrificed to a literal interpretation of the article "a."

The Commission's interpretation of chapter 92 and rule 76 also conforms with the title and stated purpose of chapter 92. *See* Tex. Gov't Code Ann. § 311.023(1), (7) (West 2005) (when construing a statute whether or not ambiguous on its face, courts may consider the "object sought to be obtained" and "title"); *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003). Chapter 92 is entitled "Mineral Use of Subdivided Land." "Subdivide" commonly means "to further divide (what has already been divided)." Webster's Third New International Dictionary 2274 (2002). Section 92.001 states the legislative purpose behind the enactment of chapter 92:

> It is the finding of the legislature that the rapidly expanding population and development of the cities and towns of this state and the concomitant need for adequate and affordable housing and suitable job opportunities call for *full and efficient utilization and development of all the land resources of this state, as well as the full development of all the minerals of this state*. In view of that finding, it is the intent of the legislature that the mineral resources of this state be fully and effectively exploited and that all land in this state be maintained and utilized to its fullest and most efficient use. It is the further finding of this legislature that it is necessary to exercise the authority of the legislature pursuant to Article XVI, Section 59, of the Constitution of the State of Texas to assure proper and orderly development of both the mineral and land resources of this state and that the enactment of this chapter will protect the rights and welfare of the citizens of this state.

12

Tex. Nat. Res. Code Ann. § 92.001 (italics added). The Commission's interpretation is consistent

with the plain language of the title and the stated purpose that the legislature intended to address the

mineral use of land that has been subdivided and to maximize the development of both the surface

and the mineral resources on the subdivided land. *Id.*

As the hearing examiners explain in the amended proposal for decision concerning

the legislature's intent in enacting chapter 92,

> Considering that the stated purpose of the enactment of Chapter 92 of the Code was
> to achieve full and efficient utilization and development of all the land resources of
> the state, as well as full development of the minerals of the state, it appears to the
> examiners implausible that it was intended that the surface owner of a 1,280-acre
> housing or mixed use development, for example, [would] be prohibited from
> obtaining the protections of § 92.005 for more than 50% of his development. The
> definition in § 92.002(3) suggests that the Commission may not approve a distinct
> subdivision containing more than 640 acres, but it does not expressly forbid approval
> of two contiguous 640-acre subdivisions created out of a single parcel of contiguous
> acreage. A more plausible interpretation is that the 640-acre limitation in the
> definition of "qualified subdivision" was intended to require the surface owner to
> reserve operations sites and road and pipeline easements for each distinct 640 acres
> or less and to require independent analysis by the Railroad Commission of the
> adequacy of such operations sites and easements for the full and efficient exploitation
> of mineral resources for each distinct 640 acres or less.

The Commission's interpretation to allow contiguous qualified subdivisions that exceed 640 acres

combined for a single proposed development satisfies the legislative intent to balance the competing

interests between the surface and mineral estates and serves the legislative intent "that *all* land in this

state be maintained and utilized to its fullest and most efficient use." *Id*. (emphasis added).

Chapter 92 as a whole also supports the Commission's interpretation of the statute

and its rule that allows contiguous qualified subdivisions that exceed 640 acres combined for a

single proposed development. *See City of San Antonio*, 111 S.W.3d at 25. Chapter 92 balances the future development of the surface estate against the subsurface mineral resources by requiring the Commission independently to consider the "adequacy of the number and location of operations sites and road and pipeline easements" for each distinct application and by providing minimum requirements for the size and location of the operations sites. *See* Tex. Nat. Res. Code Ann. § 92.004(b). Each operations site must have at least two acres and each separate 80 acres must have at least one operations site. *See id*. § 92.002(1), (3)(C); 16 Tex. Admin. Code § 3.76(a)(2), (4)(C). Additionally, after considering the evidence, the Commission must "approve, reject or amend the application to ensure that the mineral resources of the subdivision are fully and effectively exploited." *See* Tex. Nat. Res. Code Ann. § 92.004(b); 16 Tex. Admin. Code § 3.76(d). Chapter 92 ensures that the interests of owners of possessory mineral interests are protected for each distinct qualified subdivision that the Commission approves.

The Commission's interpretation of chapter 92 and rule 76 is reasonable and consistent with the legislative history of chapter 92. *See Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex. 1993) ("Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute."); *Public Util. Comm'n*, 809 S.W.2d at 207; *Railroad Comm'n v. Coppock*, 215 S.W.3d 559, 563 (Tex. App.—Austin 2007, pet. denied); *see also* Tex. Gov't Code Ann. § 311.023(3), (6) (West 2005) (whether or not statute ambiguous, court may

14

consider administrative construction of statute and legislative history).[8] The legislative history is silent on any intent to place an absolute limit on the number of contiguous qualified subdivision applications that the Commission could consider and approve or the number of applications that a single property owner could file and have approved for a proposed development based upon an absolute limit or statutory cap of acreage.

SWEPI relies upon the amendment in 1987 to section 92.002(3) that increased the acreage for a qualified subdivision from 160 to 640 acres. *See* Act of June 11, 1987, 70th Leg., R.S., ch. 274, § 1, 1987 Tex. Gen. Laws 1616, 1616.[9] SWEPI contends that the Commission's interpretation makes the amendment from 160 to 640 acres meaningless because, without the amendment, a party could have filed four applications to reach 640 acres of qualified subdivisions. Increasing the size for qualified subdivisions to 640 acres, however, provides certainty and

---

[8] Prior to the approval of the final orders here, the Commission simultaneously had approved applications for contiguous qualified subdivisions that exceeded 640 acres combined. *See* Texas Railroad Comm'n, *Application of Affiliate Crown Development, Ltd. to Consider Approval of a Qualified Subdivision Pursuant to Statewide Rule 76 for a 407.40 Acre Tract Subdivision in Montgomery County, Texas*, Docket No. 03-0245063 (January 24, 2006) (final order granting application); Texas Railroad Comm'n, *Application of Affiliate Crown Development, Ltd. to Consider Approval of a Qualified Subdivision Pursuant to Statewide Rule 76 for a 535 Acre Tract Subdivision in Montgomery County, Texas*, Docket No. 03-0245064 (January 24, 2006) (final order granting application).

[9] The legislature also amended section 92.002(3) by requiring the designation of two or more acres as an operations site for each separate 80 acres within a qualified subdivision and by allowing qualified subdivisions on barrier islands. *See* Act of June 11, 1987, 70th Leg., R.S., ch. 274, § 1, 1987 Tex. Gen. Laws 1616, 1616. Prior to the amendment, a qualified subdivision had to contain two or more operations sites within the 160 acres. *See id.*

15

protection for the parties and promotes efficiency by reducing the number of applications required for larger developments.[10]

Moreover, were we to accept SWEPI's interpretation of the language in chapter 92 and rule 76, such an interpretation would lead to absurd results. *Rylander*, 6 S.W.3d at 284. For example, an owner of a 1,000-acre property that the owner wanted to develop as a residential subdivision would be limited to an area of 640 acres for qualified subdivisions, without any consideration or balancing between the competing interests of the mineral and surface estates and the "fullest and most efficient use" of the 1,000 acres. *See* Tex. Nat. Res. Code Ann. § 92.001; *see also* Tex. Gov't Code Ann. § 311.023(5) (West 2005) (whether or not statute ambiguous, court may consider "consequences of a particular construction"); *Scott*, slip op. at 7 (court must not give words "exaggerated, forced, or constrained meaning").

SWEPI analogizes Eyhorn's two contiguous applications that exceeded 640 acres combined to plaintiffs who attempt to "escape the Legislature's statutory scheme by artful pleading." *See Murphy v. Russell*, 167 S.W.3d 835, 838-39 (Tex. 2005) (plaintiff's claim of battery dismissed because substance was medical malpractice claim and, therefore, statutorily required to file expert report); *see also In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 190 (Tex. 2007) (orig. proceeding) ("[A]rbitrability turns on the substance of a claim, not artful pleading."); *Baylor Univ. v. Sonnichsen* 221 S.W.3d 632, 636 (Tex. 2007) (focus of "legal treatment of claims [is] on the true

---

[10] For example, prior to the 1987 amendment, a developer with two 640 acre tracts would have to file and pursue eight qualified subdivision applications with the Commission, increasing the expense for the applicant and any contestants and risk to the applicant that one application will fail and jeopardize the entire project. *See id.*

nature of disputes rather than allow artful pleading to morph contract claims into fraud causes of action to gain favorable redress under the law"). We do not find these cases analogous as they focus on a plaintiff's improper re-characterization of a cause of action into a different cause of action. In contrast, Eyhorn complied with the procedures in chapter 92 and rule 76 by filing two separate applications for 640 acres, and she fully informed the Commission and SWEPI of Hidalgo County's option to buy her land and its plans for developing the two contiguous subdivisions.

Consistent with the powers that the legislature expressly conferred on it, the Commission independently analyzed Eyhorn's applications, considered the adequacy of the proposed operations sites and easements for each proposed qualified subdivision, and determined that the minerals would be "fully and effectively exploited" on the land comprising the two distinct subdivisions. *See* Tex. Nat. Res. Code Ann. §§ 92.001, .004(b); 16 Tex. Admin. Code § 3.76(d); *Public Util. Comm'n*, 53 S.W.3d at 315.[11] Applying the plain language of chapter 92 and rule 76, we conclude that the Commission did not exceed its statutory authority under chapter 92 and did not misinterpret or misapply rule 76 by approving the two separate applications for 640 acres each in its final orders.[12] We overrule SWEPI's first and second issues.

---

[11] SWEPI does not challenge the hearing examiners' conclusion of law number 4 that was adopted by the Commission in its final orders. The hearing examiners concluded: "Approval of each of the applications in these dockets will ensure that the mineral resources of each of the qualified subdivisions are fully and effectively exploited and developed."

[12] SWEPI contends that chapter 92 should be strictly construed because it deprives SWEPI of its common law right to use as much of the surface as reasonably necessary in order to develop the minerals. SWEPI urges that a larger subdivision more severely limits oil and gas operations because there is a larger area that cannot be reached. If a statute "deprives a person of a common law right, the statute will be strictly construed in the sense that it will not be extended beyond its plain meaning or applied to cases not clearly within its purview." *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex. 1969). Given our conclusion that the plain language of the statute

*C)     Landfill as "Industrial" Use*

In its third issue, SWEPI contends that the Commission exceeded its statutory authority by approving the applications because Eyhorn's land was not "subdivided in a manner authorized by law by the surface owners for residential, commercial, or industrial use." *See* Tex. Nat. Res. Code Ann. § 92.002(3)(B); 16 Tex. Admin. Code § 3.76(a)(4)(B); *see also* Tex. Gov't Code Ann. § 2001.174(2)(B).[13] SWEPI specifically urges that the proposed use of a landfill is not an "industrial use" within that term's common meaning.

SWEPI challenges the Commission's adoption of the hearing examiners' finding of fact number 6 and conclusions of law numbers 2 and 3:

6.     Each of the proposed qualified subdivisions has been subdivided in a manner authorized by law by the surface owner for industrial use.

   a.     Eyhorn is the owner of the surface estate of the acreage included in each of the proposed qualified subdivisions.

   b.     Eyhorn has filed plats of each of the proposed qualified subdivisions with the Railroad Commission showing subdivided lots and the proposed locations of operations sites for exploration, development, and production of minerals and road and pipeline easements necessary to use the operations sites.

supports the Commission's interpretation, it follows that the interpretation does not extend the statute "beyond its plain meaning." *See id.*

[13]     Without providing additional argument or authorities, SWEPI contends that the Commission's final orders also are "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." *See* Tex. Gov't Code Ann. § 2001.174(2)(F) (West 2008). For the same reasons that we conclude that the Board did not exceed its statutory authority, we also conclude that the Commission's orders were not arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *See id.*

18

c. Under Hidalgo County subdivision rules, approval of the Commissioner's Court of Hidalgo County of qualified subdivision plats is not required prior to Railroad Commission approval. Under these subdivision rules, a parcel of land is considered subdivided for residential, commercial, or industrial use when a plat delineating tract boundaries, oil and gas operations sites, pipeline easements, road easements or other boundaries is filed with the Railroad Commission as a part of an application for approval of a qualified subdivision.

d. The acreage covered by the two proposed qualified subdivisions is subject to an option to purchase contract between Eyhorn, as current surface owner, and Hidalgo County, as purchaser.

e. Hidalgo County proposes to use each of the proposed qualified subdivisions for a landfill and associated landfill facilities.

* * *

2. All things necessary to the Commission attaining jurisdiction over the subject matter and the parties in these dockets have been performed or have occurred.

3. Each of the applications for approval of qualified subdivisions in these dockets meets and complies with all requirements for approval of Chapter 92 of the Texas Natural Resources Code and Railroad Commission Statewide Rule 76.

SWEPI urges that the legislature did not intend landfill operations as the type of use it was trying to protect in enacting chapter 92. SWEPI focuses on references in the legislative history to "buildings," "developing urban areas," and "real-estate development."[14] SWEPI urges that the

---

[14] The House Committee on Energy in its bill analysis references by way of background that "cities are expanding out over adjacent farm and ranch land to meet the needs of the people for residential, commercial, and industrial buildings." House Comm. on Energy, Bill Analysis, Tex. S.B. 946, 68th Leg., R.S. (1983). The bill analysis from the senate natural resources committee states in the background section that "bank[s] or other lending institutions are reluctant to lend construction capital if there is a possibility that the building they finance, such as a warehouse, might later be demolished by the subsurface mineral owners in order for the minerals to be brought to the surface." Senate Comm. on Nat. Res., Bill Analysis, Tex. S.B. 946, 68th Leg., R.S.

19

"focus in adopting the statute was in reconciling the land use needs of local urban real estate development with full and effective development of the state's mineral resources." The legislative history, however, is silent on what constitutes an "industrial use." And the Commission's interpretation that a landfill is an industrial use within the meaning of section 92.002(3)(B) is reasonable and does not contradict the plain language of the statute. *See Moore,* 845 S.W.2d at 823; *Coppock*, 215 S.W.3d at 563. The common meaning of "industrial" when used as an adjective means "of or belonging to industry." Webster's Third New International Dictionary 1155 (2002).[15]

That the legislature intended for residential subdivisions or commercial or industrial office parks to fall within the types of uses allowed under the statute does not preclude other uses, such as landfill operations, from also falling within the types of uses allowed. Section 92.002(3)(A) expressly defines the counties in which a qualified subdivision may be created based upon the population of the county: the tract of land must be "located in a county having a population in excess of 400,000, or in a county having a population in excess of 140,000 that borders a county having a

---

(1983). The House Research Organization noted that chapter 92 was passed to allow "both real-estate development and mineral exploration." House Research Organization, Daily Report for May 20, 1987.

   [15] Interpreting "industrial use" to include landfill operations is consistent with traditional zoning concepts of "industrial use districts." *See* Robert M. Anderson, 2 *American Law of Zoning 3d* § 9.44 (1986) ("Industrial districts traditionally have been the receptacle into which all uses are placed after those worthy of protection have been provided for. Not infrequently these zones have been denominated 'unrestricted,'. . ."); Patrick J. Rohan, 7 *Zoning and Land Use Controls* § 39.06 (2009) ("Traditional zoning schemes place industrial uses at the bottom of the hierarchy of uses. Thus, beginning with what is considered the highest, most sensitive use of property, the single-family detached home, zoning codes typically move down through high density residential uses and commercial uses before they reach the lowest classification, industrial use.").

population in excess of 400,000." *See* Tex. Nat. Res. Code Ann. § 92.002(3)(A).[16] Other than the

population requirement, there is no expressed restriction that a qualified subdivision only be in urban

areas or for development that includes buildings. *See id.*; *Cameron*, 618 S.W.2d at 540.

SWEPI relies upon subsection (c) of section 92.005 to support that the legislature did

not intend for a landfill to be an "industrial use." *See* Tex. Nat. Res. Code Ann. § 92.005(c). Section

92.005(c) provides the circumstances when the restrictions on an owner of a possessory mineral

interest in a qualified subdivision cease to apply:

> (c)     This section ceases to apply to a subdivision if, by the third anniversary of the
>         date on which the order of the commission becomes final:
>
> > (1)     the surface owner has not commenced actual construction of roads or
> >         utilities within the qualified subdivision; and
> >
> > (2)     a lot within the qualified subdivision has not been sold to a third
> >         party.

*See id.* SWEPI focuses on the requirement in subsection (c)(2) that a lot be sold to a third party to

support that the uses intended were "urban real estate development, like residential subdivisions and

commercial or industrial office parks." But the plain language of subsection (c) is that both

subsections (1) and (2) must apply for the restrictions on the owner of the possessory mineral interest

to cease. If construction of roads or utilities is commenced within three years of the order from the

Commission becoming final—whether or not a lot is sold to a third party—section 92.005(c) does

---

[16] A surface owner also may create a qualified subdivision on a tract of land on a barrier island. *See* Tex. Nat. Res. Code Ann. § 92.002(3)(A) (West 2001).

21

not apply. *See City of San Antonio*, 111 S.W.3d at 25. Section 92.005(c) does not support limiting "industrial use" as SWEPI proposes.

Applying the common meaning of "industrial use," we conclude that the Commission did not exceed its statutory authority by interpreting "industrial use" to include landfill operations.[17] *See* Tex. Nat. Res. Code Ann. § 92.002(3)(B); 16 Tex. Admin. Code § 3.76(a)(4); *City of San Antonio*, 111 S.W.3d at 25. We overrule SWEPI's third issue.

### *Declaratory Relief*

In its fourth and fifth issues, SWEPI contends that the district court erred in granting the Commission's plea to the jurisdiction as to its declaratory claims under the Act and under section 2001.038(a) of the government code. Alternatively, SWEPI contends that the district court erred in granting the Commission's pleas as to its alternative requests for declaratory relief concerning the meaning of the Commission's final orders.

In its plea to the jurisdiction, the Commission contended that the district court did not have jurisdiction of SWEPI's declaratory claims because those claims were redundant of its claims challenging the Commission's final orders under section 2001.174 of the APA and that full relief was available to SWEPI as part of its suit for judicial review of the Commission's final orders. SWEPI urges that it pled and proved that its requests for declaratory relief did not duplicate its

---

[17] Prior to Eyhorn's applications, the Commission had considered and approved a qualified subdivision application for landfill operations. *See* Texas Railroad Comm'n, *Application of E&D Waste Systems, Inc. for Approval of a Qualified Subdivision Pursuant to Statewide Rule 76 for a 99.9733 Acre Tract of Land in Abstracts Nos. 601 and 607, Galveston County, Texas*, Docket No. 3-84,416 (Oil & Gas Div'n August 19, 1985) (final application approving qualified subdivision for use as a landfill).

22

administrative appeal but were broader because a decision on the administrative appeal "[did] not necessarily settle the underlying dispute between the parties over the scope of the Commission's authority." *See Texas Mun. Power Agency v. Public Utility Comm'n*, 253 S.W.3d 184, 200 (Tex. 2007) (remanding declaratory claims that are "distinct from and not duplicative of the claims for judicial review of Commission orders").

We review the trial court's ruling on a plea to the jurisdiction *de novo*. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). A plea to the jurisdiction is a dilatory plea that contests the trial court's authority to determine the subject matter of the cause of action without regard to whether the claims asserted have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

Section 37.004(a) of the Act provides that a person "whose rights, status, or legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). Section 2001.038(a) of the government code provides, "The validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038(a).

A declaratory judgment claim "will not lie" when it is "redundant" of a parallel administrative appeal and the "remedy under the APA is the same as that provided under the [Act]"—reversal of the agency's final order. *Texas Mun. Power Agency v. Public Util. Comm'n*,

260 S.W.3d 647, 651 (Tex. App.—Austin 2008, no pet.) (citing and quoting *Texas Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970)); *see also Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 911 (Tex. App.—Austin 1998, pet. denied) ("When a statute provides a method for attacking an agency order, a declaratory judgment action directed at that order will not lie."); *Texas Dep't of Transp. v. Texas Weekly Advocate*, No. 03-09-00159-CV, 2010 Tex. App. LEXIS 566, at *8 (Tex. App.—Austin Jan. 29, 2010, no pet.) (mem. op.) ("A [declaratory judgment] action cannot stand if there is a pending action that resolves the exact issues raised under the [Act].") (citing and quoting *Texas Liquor Control Bd.*, 456 S.W.2d at 895).

Here it is clear that SWEPI's declaratory claims duplicate its claims and available remedies under its administrative appeal of the Commission's final orders. SWEPI sought the following declarations in its pleadings:

- Section 92.002(3) of the Code and Statewide Rule 76(a)(4) limit the Commission's authority to consider and/or approve applications for "qualified subdivisions" to no more than 640 acres;

- The Commission had no authority to consider or approve the Applications, because to do so was tantamount to considering and approving a "qualified subdivision" of more than 640 acres;

- The Commission exceeded its statutory authority and violated its own rule by considering and approving the Applications;

- The Commission exceeded its statutory authority and violated its own rule when it refused to dismiss the Applications upon [SWEPI]'s motion;

- The Commission exceeded its statutory authority and violated its own rule when it adopted the orders . . . , effectively granting "qualified subdivision" status to a tract of more than 640 acres; and

24

•    The Commission has applied Statewide Rule 76 in a manner that interferes with or impairs a legal right or privilege of [SWEPI].

* * *

•    The words "residential, commercial and industrial use" as found in the definition of "qualified subdivision" in Tex. Nat. Res. Code § 92.002(3)(B), do not include a use as a landfill within the meaning of these terms.

•    The words "residential, commercial and industrial use" as found in the definition of "qualified subdivision" in Statewide Rule 3.76(a)(4)(B), do not include a use as a landfill within the meaning of these terms.

SWEPI's declaratory claims are based upon the same statutory construction arguments that it made at the consolidated hearings before the Commission and that it made to the district court in its administrative appeal of the Commission's final orders. An available remedy in its administrative appeal was the reversal of the Commission's orders if the orders were "in excess of the agency's statutory authority." *See* Tex. Gov't Code Ann. § 2001.174(2)(B). The district court necessarily decided the substance of SWEPI's declaratory claims when it affirmed the Commission's final orders—interpreting chapter 92 and rule 76 to authorize the Commission to approve Eyhorn's two applications for contiguous qualified subdivisions of 640 acres each and for development as a landfill. *See id.* SWEPI's declaratory claims would provide no additional relief.

SWEPI cites *City of Waco v. Texas Natural Resource Conservation Commission*, 83 S.W.3d 169 (Tex. App.—Austin 2002, pet. denied), to support the district court's jurisdiction to consider its declaratory claims. We find the analysis in *City of Waco* inapplicable here. In that case, this Court held that the district court had jurisdiction to consider the city's request for a declaration that the TNRCC could not grant additional permits in a watershed area until the city complied with

25

federal regulations that were incorporated into state law. *Id*. at 173. Unlike here, the City was not attacking an agency order or rule, and the only ground for dismissal that the TNRCC raised was one of ripeness—"that the controversy [was] hypothetical and not ripe for adjudication apart from a specific permit application." *Id*. at 178. This Court made clear that "[t]he City [was] not appealing from a specific agency action and [was] not challenging the validity or application of an agency rule," but rights it alleged it was afforded under federal regulation. *Id*. In that context, this Court held that the district court had jurisdiction to consider the city's request for declaratory relief "on a purely legal issue." *Id*. at 178.[18]

As to SWEPI's alternative claims for declarations of its legal rights, status, and relations under the Commission's final orders, SWEPI contends that there is confusion surrounding the restrictions placed on SWEPI because it is not clear if SWEPI is subject to the original plats filed and approved by Hidalgo County or if the revised plats that the Commission approved and incorporated into its final orders replaced the plats originally filed in Hidalgo County. SWEPI's complaint focuses on alleged uncertainty created by Eyhorn's filing of amended plats for the subdivisions during the pendency of the applications before the Commission and concerns that Hidalgo County may impose restrictions on SWEPI in the future based upon the original plats.

---

[18] SWEPI's reliance on *El Paso Hospital District v. Texas Health and Human Services Commission*, 247 S.W.3d 709 (Tex. 2008), and *City Public Service Board of San Antonio v. Public Utility Commission*, 96 S.W.3d 355 (Tex. App.—Austin 2002, no pet.), is similarly misplaced. Neither case addressed the issue raised by the Commission here—whether asserted declaratory claims were redundant of the issues and available remedies in a parallel administrative appeal. In *El Paso Hospital*, the issue was whether the agency's method of calculating certain rates was an agency rule and, if so, if it was valid. 247 S.W.3d at 711. And in *City Public Service*, this Court addressed the direct appeal provisions of the public utilities act. 96 S.W.3d at 356.

Section 92.004(a) specifies that applications must be accompanied by a plat of the subdivision showing the proposed locations of operation sites and easements. *See* Tex. Nat. Res. Code Ann. § 92.004(a). But section 92.004(b) authorizes the Commission itself to amend a plat prior to approval and section 92.006 expressly allows a surface owner to abandon, replat, or amend any portion of a subdivision as long as the amendment or replatting is approved by the Commission. *See id*. §§ 92.004(b), .006. Section 92.006 further protects the owner of possessory mineral interests because an amendments or replat "may not alter, diminish, or impair the usefulness of an operations site or appurtenant road or pipeline easement unless the amendment or replat is approved by the commission in accordance with Section 92.003 of this Code." *See id*. § 92.006. Here Eyhorn's revisions to the plats were made in part to provide more surface area for SWEPI's oil and gas operations sites and to accommodate the new well that SWEPI drilled on one of the subdivisions during the pendency of the applications before the Commission.

In any event, the Act may not be used to obtain an impermissible advisory opinion to interpret the Commission's final orders.[19] *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) (Act "merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions"); *Alamo Express, Inc. v. Union City Transfer*, 309 S.W.2d 815,

---

[19] Eyhorn initially filed a proposed subdivision plat, a metes and bounds description and use restrictions, and a "map of topograph and drainage" with Hidalgo County for both subdivisions. The revised plats that were approved by the Commission consist of one page per subdivision depicting the location of the oil and gas operations sites and easements.

827-28 (Tex. 1958) (request for a declaratory judgment of meaning of agency order and its various provisions seeking impermissible advisory opinion).

We conclude that the district court did not err in granting the Commission's plea to the jurisdiction concerning SWEPI's declaratory claims. We overrule SWEPI's fourth and fifth issues.

## CONCLUSION

Having overruled SWEPI's issues on appeal, we affirm the district court's judgment, affirming the Commission's final orders and granting the Commission's plea to the jurisdiction on SWEPI's declaratory claims.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: May 11, 2010

28