# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00217-CV

**City of Waco, Appellant**

v.

**Texas Natural Resource Conservation Commission; and Jeffrey A. Saitas,
as Executive Director, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. GN1-00654, HONORABLE PAUL DAVIS, JUDGE PRESIDING

This appeal concerns whether a dispute about the Texas Natural Resource Conservation Commission=s (the TNRCC=s) permit-issuing process is ripe for judicial review by the district court. The Bosque River, a tributary of the Brazos River, is located northwest of the city of Waco. Segments 1226 and 1255 of the North Bosque River have been listed as having impaired water quality due to high levels of nutrients. *See* 30 Tex. Admin. Code '' 307.1-.10 (2001) (Tex. Natural Res. Conservation Comm=n, Tex. Surface Water Quality Standards). Near its point of confluence with the Brazos River, the Bosque River forms Lake Waco, which provides the sole source of drinking water for approximately 150,000 people in and around Waco; the lake is also used extensively for recreational activities. The water quality of Lake Waco, which is a Asink@ for any dissolved pollutants in the Bosque River, is likewise impaired. Numerous dairy operations are located northwest of Waco in Erath County in the Bosque River watershed. The dairies must seek confined animal feeding operation (CAFO) permits from the TNRCC because the

agricultural waste from their operations, which becomes dissolved in runoff or is otherwise discharged, ultimately discharges into the river.

This dispute arose when the TNRCC promulgated an order in February 2000 regulating future permits for CAFOs. Both the City of Waco (the City) and the Texas Association of Dairymen (the Dairymen) filed actions for declaratory judgments attacking the order. The TNRCC responded by withdrawing the order and moving to dismiss both actions as moot and not ripe. The City amended its petition to seek declaratory relief that the TNRCC=s interim policy of continuing to issue any permits violates state regulations. The district court dismissed the actions. Both the Dairymen and the City appealed the dismissal of their suits for declaratory relief. However, following oral argument, the Dairymen voluntarily

dismissed their appeal.[1]  The only remaining issue before us is the ripeness of the City=s suit for declaratory relief.[2]

Specifically, the City seeks a declaration that the TNRCC may not grant any additional permits for CAFOs in the Bosque River watershed until it complies with certain federal regulations that have been incorporated into state law.  *See* 30 Tex. Admin. Code ' 305.538 (1999) (Tex. Natural Res. Conservation Comm=n, Prohibitions for TPDES Permits) (Ano permit may be issued under the conditions

---

[1]  The TNRCC filed a motion to dismiss the Dairymen=s appeal on the ground that legislative action had mooted the association=s appeal.  Because the Dairymen voluntarily dismissed their appeal, we overrule the TNRCC=s motion.

[2]  The TNRCC=s motion to dismiss the Dairymen=s and the City=s claims asserted mootness and ripeness grounds.  After a hearing, the trial court granted the motion.  The order states that A[a]fter considering the motion, the responses, and the evidence filed in support of the motion and responses, the court: GRANTS the motion and DISMISSES [the consolidated causes].@ In its brief, the TNRCC asserts that the City=s claims is moot *and* not ripe.  A claim cannot logically be both moot and unripe; it is either moot or not ripe.  While the City=s original claims may have been rendered moot by the TNRCC=s action revoking its order, it amended its petition to state a different claim based on the TNRCC=s policy.  We conclude therefore that the issue should be analyzed in terms of ripeness.

prohibited in 40 Code of Federal Regulations ' 122.4, as amended@). The City maintains that it seeks resolution of a pure question of law: whether section 122.4(i) operates to bar *all* new permits until the TNRCC has developed an implementation scheme to reduce pollution in the two impaired segments of the Bosque River. The TNRCC contends that its compliance with the regulations can only be determined in the context of a permit application on the facts presented by a particular application. Because we agree with the City that its request for declaratory relief presents a determination of law, we reverse the district court=s order of dismissal and remand this cause for consideration on the merits.

### FACTUAL AND PROCEDURAL BACKGROUND

During the 1980s, the dairy industry expanded greatly in the North Bosque River watershed. Erath County became the leading county in the state for milk production. This reflects a trend in the dairy industry away from small, geographically scattered dairies toward large-scale, clustered dairy operations. In early 2001, the TNRCC estimated that there were 41,000 milk cows concentrated along the Bosque River watershed. The waste produced by these concentrated operations has impaired the water quality of the adjacent stretches of the North Bosque River. The TNRCC has identified the primary source of the pollution to be phosphorus, which is a nutrient found in animal waste. The large amounts of phosphorus in the water have caused excessive growth of algae and other aquatic plants, which in turn potentially cause distaste and odor in drinking water and, under certain circumstances, contribute to the depletion of dissolved oxygen.

Under the federal Clean Water Act, a state is required to "identify those waters within its boundaries for which the effluent limitations required by [the Act] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. ' 1313(d)(1)(A) (2001). In 1998, the TNRCC listed two segments of the Bosque River as "impaired under narrative water quality standards related to nutrients and aquatic plant growth." Once the TNRCC identified the water segments as impaired, it was required to develop a Total Maximum Daily Load (TMDL), which is a plan for assimilation of the pollutants that are present in the water. *See id.* ' 1313(d)(1)(C).[3] The TNRCC describes a TMDL as

> a quantitative plan that determines the amount of a particular pollutant that a water body can receive and still meet its applicable water quality standards. In other words, TMDLs are the best possible estimates of the assimilative capacity of the water body for a pollutant under consideration. A TMDL is commonly expressed as a load, with units of mass per time period, but may be expressed in other ways also. TMDLs must also estimate how

---

[3] Under the Clean Water Act, the TNRCC is also required to develop a "continuing planning process" for reducing the pollution and bringing the water segments up to state water quality standards for nutrients and pathogens. *See* 33 U.S.C. ' 1313(e) (2001). This process must include, in part, plans for "effluent limitations and schedules of compliance at least as stringent as those [required under provisions of the Clean Water Act]," "the incorporation of all elements of any applicable area-wide waste management plans," total maximum daily loads for pollutants in accordance with subsection (d), and "adequate implementation, including schedules of compliance, for revised or new water quality standards." *Id.*

much the pollutant load needs to be reduced from current levels in order to achieve water quality standards.

More than three years after the TNRCC identified the watershed as impaired, the TNRCC had still not established a TMDL plan. Although the agency Aanticipated@ in late 1999 that it would be able to submit a proposed TMDL to the Environmental Protection Agency (EPA) by the spring of 2000, the TNRCC did not complete a TMDL until early 2001. The TNRCC has now sent a TMDL to the EPA for approval; at the time the parties submitted their briefs in this cause, however, the TMDL had not been approved by that agency.

The TMDL confirms that a major controllable source of the phosphorus in the water comes from the dairy farms concentrated in the watershed. It recommends that forty to sixty percent reductions in phosphorus loadings in some areas and fifty percent overall will be needed to reduce the potential for problematic algae growth. The City notes various problems with the proposed TMDL. The City argues that its recommendations are based on now outdated information; the number of permits currently pending with the TNRCC, if approved, would increase the number of authorized cows by 20,000, so the previously recommended levels of the TMDL will not achieve attainment of water quality standards.[4] In addition, the TMDL does not establish the amount of phosphorus loadings, allocated among the dairies and

---

[4] The TMDLs are based on data that was collected during the mid-1990s. The TNRCC has noted similar concerns with the reliability of the data. An interagency memo states that the TMDL=s Ademonstration of feasibility is based in large part on computer model simulations that estimated the amount of dairy waste to be applied and otherwise disposed of based on the number of dairy cows existing or permitted in the watershed. If the waste projection changes significantly due [to] increasing number of animals, the model numbers are less useful for supporting TMDL approval.@

other dischargers, that could be tolerated without violating water quality standards for pathogens and nutrients. Nor does it implement compliance schedules for the dairies and other dischargers to reduce the pathogens in the two impaired water segments.

Compounding these failures with respect to existing dischargers, the City asserts that the TNRCC has worsened the situation by approving new applications for additional discharges of waste into the already polluted river. With the exception of certain small operations, the dairies in the watershed are required to obtain CAFO permits from the TNRCC that allow them to discharge waste from their operations. The City asserts that since declaring the segments impaired, the TNRCC has continued to grant permits for new and expanded uses under an evolving Ainterim policy.@ Although this interim policy has taken slightly different forms in recent years, the City asserts that every phase of the policy grants the agency the discretion to issue new permits, contrary to the regulations prohibiting additional CAFOs until the TNRCC implements measures that will improve the water quality to meet state standards.

The Executive Director of the TNRCC testified that the agency will exercise its discretion to grant new permits as long as the additional discharge will not worsen the Aenvironmental status quo@ of the impaired river. The agency also points to a rule that it says embodies this policy. *See* 30 Tex. Admin. Code ' 321.33 (2001) (Tex. Natural Res. Conservation Comm=n, Confined Animal Feeding Operations, Applicability).[5] The City argues that the TNRCC=s current discretionary policy is at odds with state law which requires that a sufficient allocation be available for the water to receive the additional loading and still

---

[5] The current administrative code is cited for convenience.

meet state water quality standards. *See id.* ' 305.538 (1999) (prohibiting permit that would violate 40

C.F.R. ' 122.4). The City sought a declaration that

> until the TNRCC promulgates legally binding regulations to implement TMDLs for nutrients and pathogens in the two Bosque Segments that contain load allocations and other measures that will assure compliance with the state water quality standards, no permit may be issued to construct or operate a new CAFO . . . within the watershed.

The TNRCC argues that the City=s suit would not be ripe until the TNRCC issued a specific permit. The

district court agreed with TNRCC and dismissed the suit. The City now appeals from that judgment.

## DISCUSSION

Ripeness implicates subject-matter jurisdiction and emphasizes the requirement of a

concrete injury in order to present a justiciable claim. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d

849, 851 (Tex. 2000); *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998). Ripeness is

concerned with when an action can be brought and seeks to conserve judicial time and resources for

real and current controversies rather than hypothetical or remote disputes. *Gibson*, 22 S.W.3d at 851;

*Patterson*, 971 S.W.2d at 442-43. Courts of this state may not issue advisory opinions. *Patterson*, 971

S.W.2d at 443; *Texas Ass=n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). An

opinion issued in a case that is not ripe would address only a hypothetical injury rather than

remedying actual or imminent harm. *See Texas Ass=n of Bus.*, 852 S.W.2d at 444.

In determining whether a cause is ripe for judicial consideration, we look to see

whether the facts have sufficiently developed to show that an injury has occurred, or is likely to occur.

*Patterson*, 971 S.W.2d at 442. A claimant is not required to show that the injury has already occurred, provided the injury is imminent or sufficiently likely. *Gibson*, 22 S.W.3d at 852; *Patterson*, 971 S.W.2d at 442. Likewise, a person seeking a declaratory judgment need not have incurred actual injury; a declaratory judgment action will lie if the facts show the presence of Aripening seeds of a controversy.@ *Texas Dep=t of Banking v. Mount Olivet Cemetery Ass=n*, 27 S.W.3d 276, 282 (Tex. App.CAustin 2000, pet. denied) (quoting *Texas Dep=t of Pub. Safety v. Moore*, 985 S.W.2d 149, 153-54 (Tex. App.CAustin 1998, no pet.)).

The City contends that its claim that section 122.4(i) of the Code of Federal Regulations, which has been incorporated into state law, prohibits the TNRCC from issuing permits for new[6] CAFOs in the watershed until the TNRCC develops compliance schedules and pollutant load allocations is ripe. **Section 122.4(i) reads:**

> No permit may be issued [t]**o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards. The owner or operator of a new source or new discharger proposing to discharge into a water segment which does not meet applicable water quality standards or is not expected to meet those standards even after the application of the effluent limitations required by sections 301(b)(1)(A) and 301(b)(1)(B) of CWA,** *and for which the State or interstate agency has performed a pollutants load allocation for the pollutant to be discharged*, **must demonstrate, before the close of the public comment period, that:**

---

[6] A CAFO that currently operates under a permit may also seek a permit for additional or expanded uses. Section 122.4(i) applies only to a permit for a new source or discharger. *See* 40 C.F.R. ' 122.4(i) (2001). Therefore, the City has stipulated that its appeal is limited to permits for new CAFOs.

(1) *There are sufficient remaining pollutant load allocations to allow for the discharge*; and

(2) *The existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards.* The Director may waive the submission of information by the new source or new discharger required by paragraph (i) of this section if the Director determines that the Director already has adequate information to evaluate the request. An explanation of the development of limitations to meet the criteria of this paragraph (i)(2) is to be included in the fact sheet to the permit under ' 124.56(b)(1) of this chapter.

40 C.F.R. ' 122.4(i) (2001) (Envtl. Prot. Agency, Nat=l Pollutant Discharge Elimination Sys., Prohibitions) (**emphasis added**). The City interprets section 122.4(i) to mean that Ano discharge permit may be issued to a new CAFO within the impaired watershed until the TNRCC promulgates regulations to implement TMDLs for phosphorous and pathogens in the two Bosque Segments that contain load allocations and compliance schedules.@

Under the TNRCC=s interpretation, section 122.4(i) does not obligate the agency to develop load allocations and compliance schedules before it issues a new discharge permit; rather, it merely limits the TNRCC=s ability to issue permits that would Acause or contribute **to the violation of water quality standards.@** Whether a new permit will cause or contribute to the violation of water quality standards, the agency continues, depends on the specific conditions and terms of a given permit. The TNRCC argues that the City=s claim does not present a pure question of law because the agency=s compliance with section 122.4(i) can only be determined in the context of an application for a permit. Thus, according to the TNRCC, the City=s claim is not ripe until the agency approves a permit,

because only at that point can one determine whether the permit will cause or contribute to a violation of water standards. The agency also emphasizes that variations between state and federal law affect whether a particular permit violates section 122.4(i).

The City responds that the particular conditions of any permit are irrelevant because under the agency=s rules and policy, every new permit to discharge into impaired waters violates section 122.4(i). The City points to the rules governing CAFOs,[7] which specifically authorize discharges in Achronic or catastrophic rainfall events.@ *See* 30 Tex. Admin. Code ▪▪ 321.31(b), .32(8), .34, .39(f)(19)(E) (2001) (Tex. Natural Res. Conservation Comm=n, Concentrated Animal Feeding Operations). The City also maintains that the TNRCC=s own evidence indicates that only about half of the waste produced by CAFOs is ever Acollectible.@ Even if all of the Acollectible waste@ is prevented from entering the watershed, other uncollectible waste is not. Therefore, issuing an additional permit without pollutant load allocations and compliance schedules will violate section 122.4(i), regardless of the conditions that are imposed. Furthermore, according to the City, differences between state and federal law are not relevant to its declaratory judgment suit, which is premised solely on the basis of state law. The City notes that section 122.4(i) has been incorporated into and become part of state law, and that its claim is based on the TNRCC=s failure to implement standards to comply with state, not federal, water quality standards.

---

[7] These are the rules that currently govern the CAFO permit process. *See* Tex. Water Code Ann. ▪ 26.503(b)(1) (West Supp. 2002) (stating that an individual permit must Aprovide for management and disposal of waste in accordance with Subchapter B, Chapter 321, Title 30, Texas Administrative Code@).

We conclude that the question of whether section 122.4(i) operates to prohibit the TNRCC from approving any new discharge permits until it adopts the necessary pollution-reduction measures presents a purely legal inquiry. In determining ripeness, courts should examine (1) the fitness of the issues for judicial decision, and (2) the hardship occasioned to a party by the court=s denying judicial review. *Office of Pub. Util. Counsel v. Public Util. Comm=n*, 843 S.W.2d 718, 724 (Tex. App.CAustin 1992, writ denied). The City=s claim poses a purely legal questionCthe interpretation of section 122.4(i)Cwhich will not benefit from the development of additional facts in connection with a specific permit application. The TNRCC asserts that the issues are not fit for decision because the City has failed to challenge a final agency action. Citing provisions in the Water Code and the Administrative Procedure Act (APA), the TNRCC emphasizes that judicial review is limited to agency rulings, orders, decisions, or other acts, or the validity or applicability of a rule. *See* Tex. Water Code Ann. ' 5.351 (West 2000); Tex. Gov=t Code Ann. ' 2001.038 (West 2000).

The City, however, has asserted a different basis for its lawsuit, specifically, sections 37.002-.004 of the Uniform Declaratory Judgments Act (UDJA). *See* Tex. Civ. Prac. & Rem. Code Ann. '' 37.002-.004 (West 1997). Under that Act, a claimant=s access to judicial review is not limited to review of agency rules; instead, the Act provides a basis by which a claimant can obtain a declaration of rights, status, or other legal relations under a writing or a statute. *See id.* ' 37.004. A suit under the UDJA is not confined to cases in which the parties have a cause of action apart from the Act itself. *Texas Dep=t of Pub. Safety v. Moore*, 985 S.W.2d 149, 153 (Tex. App.CAustin 1998, no pet.). The legislature intended

**12**

the UDJA to be remedial, to settle and afford relief from uncertainty and insecurity with respect to rights, and to be liberally construed. Tex. Civ. Prac. & Rem. Code Ann. ' 37.002; *Moore*, 985 S.W.2d at 153.

The TNRCC also questions the fitness of the issues for decision, asserting that the City=s request will affect additional parties who are not present to defend their interests. The City responds that it is questionable that any such additional parties would have adequate standing to participate in a challenge to an individual permit. Furthermore, the TNRCC=s assertion does not go directly to the ripeness inquiry, which determines *when* an action may be brought, that is, Awhether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote.@ *See Patterson*, 971 S.W.2d at 442. The facts have sufficiently developed as between the TNRCC and the City such that the dispute is not hypothetical. In addition, an interested party may intervene in the proceedings on remand. *See* Tex. R. Civ. P. 60.

Moreover, the denial of judicial review will result in hardship to the City. Under the APA, a permit issued in a contested case is final, even while an appeal is pending. *See* Tex. Gov=t Code Ann. ' 2001.144. The effect of forcing the City to wait until the TNRCC has granted another permit means, in effect, that Lake Waco could become more polluted with the additional discharge while the parties litigate their dispute. Moreover, the City could suffer multiple harms from multiple additional CAFOs, and be forced to make this same legal argument in numerous appeals. Thus, the City=s claim satisfies both prongs of the ripeness inquiry.

Furthermore, the City=s claim is appropriately brought pursuant to the Declaratory Judgment Act. Under that act, a claimant must show that (1) a justiciable controversy exists as to the rights and status

**13**

of the parties; and (2) the controversy will be resolved by the declaration sought. *Moore*, 985 S.W.2d at 153. There is a justiciable controversy between the parties regarding the effect of section 122.4(i) on the agency=s permitting process. The City asserts that the TNRCC has a duty to improve the water quality of the impaired river segments without further delay, and that the agency has no discretion to issue new CAFO permits until it takes these affirmative steps. The TNRCC responds that it has the discretion to grant additional permits that do not worsen the environmental status quo. A declaration regarding the effect of section 122.4(i) on the agency=s authority to issue new CAFO permits will resolve this controversy. Therefore, we hold that the trial court had jurisdiction to hear the City=s claim under the UDJA and that the issue is ripe for adjudication.[8]

## CONCLUSION

Because we find that the City=s declaratory judgment request turns on a purely legal issue, we reverse the order of dismissal and remand this cause for consideration of the issue presented.


Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

---

[8] The City also asserts that subsections (a) and (d) of section 122.4 place restrictions on the TNRCC=s permitting process. *See* 40 C.F.R. '' 122.4(a), (d) (2001). Having found that the City=s claim under section 122.4(i) presents a ripe controversy, we need not consider these additional arguments.

14

Reversed and Remanded

Filed:   May 9, 2002

Publish