# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00005-CV

**City of Waco, Appellant**

**v.**

**Texas Commission on Environmental Quality, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GV-08-000405, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## DISSENTING OPINION

In *Grissom* and *Collins*,[1] the cases relied upon by the majority, this Court addressed—and the majority now ignores—the statutory mechanism by which the Commission—and the State—balance economic development and water quality protection under the Texas Water Code. It is undisputed that in 1998 the river segment at issue was placed on a statutory list of impaired waterways. The majority upholds the Commission's decision to deny the City of Waco "affected person" status, despite the City's role in protecting its sole water supply, Lake Waco, concerning the approval of a "major" amendment—including an increase from 690 cows to 999 cows—to a Concentrated Animal Feeding Operation (CAFO) permit for O-Kee Dairy, a dairy located upstream from Lake Waco and on the impaired river segment. *See* Tex. Water Code

---

[1] *Collins v. Texas Natural Res. Conversation Comm'n*, 94 S.W.3d 876, 884-85 (Tex. App.—Austin 2002, no pet.); *United Copper Indus., Inc. v. Grissom*, 17 S.W.3d 797, 802 (Tex. App.—Austin 2000, pet. dism'd as moot).

Ann. §§ 5.115(a), 26.503 (West 2008). In the same order, the Commission denied the City's request for a contested case hearing, approved the major amendment, and issued the permit. By affirming the Commission's order, the majority effectively allows the Commission to sidestep the legislative directive to afford an "affected person" the opportunity to be heard on disputed, relevant, and material issues of fact concerning a CAFO permit. *See id.* It is neither necessary nor proper to interpret the water code to bypass a hearing on the City's status as an "affected person" on the evidence presented by the City.

The City's request for relief is a modest one: a hearing. At a minimum, I would reverse the district court's judgment and remand the issue of whether the City is an "affected person" to the Commission for referral to the State Office of Administrative Hearings (SOAH). *See* 30 Tex. Admin. Code § 55.211 (2010) (Commission on Environmental Quality, Commission Action on Requests for Reconsideration and Contested Case Hearing). I therefore respectfully dissent.

***Statutory and Regulatory Requirements***

> *A)*      *Applicable Statutes and Regulations for Determining "Affected Person" Status and Right to a Contested Case Hearing*

Section 55.211 of title 30 of the administrative code sets forth procedures for Commission action on requests for contested case hearings. *Id.* Section 55.211 provides that Commission consideration on requests for contested cases is "not itself a contested case subject to the APA" and that the Commission "will evaluate public comment, executive director's response to comment . . . and requests for contested case hearing." *See id.* § 55.211(a), (b). Although the Commission may "determine that a hearing request does not meet the requirements of this

2

subchapter, and act on the application," the Commission alternatively may refer a hearing request to SOAH to determinate whether a person is an "affected person" entitled to request a contested case:

> The referral may specify that SOAH should prepare a recommendation on the sole question of whether the requestor is an affected person. If the commission refers the hearing request to SOAH it shall be processed as a contested case under the APA.

*Id*. § 55.211(b)(2), (4).

Section 55.211(c)(2) provides that a request for a contested case hearing "shall be granted if the request is . . . made by an affected person" and the request:

(A)     raises disputed issues of fact that were raised during the comment period, that were not withdrawn by the commenter by filing a withdrawal letter with the chief clerk prior to the filing of the executive director's response to comment, and that are relevant and material to the commission's decision on the application;

(B)     is timely filed with the chief clerk;

(C)     is pursuant to a right to hearing authorized by law; and

(D)     complies with the requirements of § 55.201 of this title (relating to Requests for Reconsideration or Contested Case Hearing).

*Id*. § 55.211(c)(2).

Under section 5.115(a) of the water code, the legislature defines an "affected person" and directs the Commission to adopt rules specifying factors that "must be considered" in determining whether a person is an "affected person":

> For the purpose of an administrative hearing held by or for the commission involving a contested case, "affected person," or "person affected," or "person who may be

3

affected" means a person who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing. An interest common to members of the general public does not qualify as a personal justiciable interest. The commission shall adopt rules specifying factors which must be considered in determining whether a person is an affected person in any contested case arising under the air, waste, or water programs within the commission's jurisdiction and whether an affected association is entitled to standing in contested case hearings.

Tex. Water Code Ann. § 5.115(a).

In response to the legislative directive, section 55.203 of title 30 of the administrative code restates the legislature's definition of "affected person" and then sets forth factors that the Commission "shall" consider when determining "affected person" status:

(a)     For any application, an affected person is one who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application. An interest common to members of the general public does not qualify as a personal justiciable interest.

(b)     Governmental entities, including local governments and public agencies, with authority under state law over issues raised by the application may be considered affected persons.

(c)     In determining whether a person is an affected person, all factors shall be considered, including, but not limited to, the following:

  (1)     whether the interest claimed is one protected by the law under which the application will be considered;

  (2)     distance restrictions or other limitations imposed by law on the affected interest;

  (3)     whether a reasonable relationship exists between the interest claimed and the activity regulated;

  (4)     likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;

4

(5)    likely impact of the regulated activity on use of the impacted natural resource by the person; and

(6)    for governmental entities, their statutory authority over or interest in the issues relevant to the application.

30 Tex. Admin. Code § 55.203 (West 2010) (Commission on Environmental Quality, Determination of Affected Person).

    *B)*    *Statutes and Regulations Applicable to the North Bosque River Watershed*

Dairy CAFOs in the North Bosque River watershed[2] have been a source of contention and concern for at least the past decade. *See City of Waco v. Texas Natural Res. Conservation Comm'n*, 83 S.W.3d 169, 172-75 (Tex. App.—Austin 2002, pet. denied) (describing history and legislation enacted addressing dairy CAFOs located in the North Bosque River watershed). The dairies also have been the subject of extensive scientific studies, including their impact on the water quality of the watershed and Lake Waco, and the focus of legislation and regulation enacted to address the dairies' impact on the environment, including water quality.

The North Bosque River has been deemed an "impaired" river. According to the Commission, the North Bosque River, including segment 1226, "was included in the 1998 Texas CWA § 303(d) [33 U.S.C. § 1313(d) (2001)] List and deemed impaired under narrative water quality standards related to nutrients and aquatic plant growth." In 2001, citing "recent studies" that "have indicated that under most conditions phosphorus is the limiting nutrient in the North Bosque River

---

[2] The Brazos River's flow is augmented by several major tributaries including the "Bosque River at Waco." Verne Huser, *Rivers of Texas* 75 (2000). The Brazos River ranks third in size among Texas state rivers and "rates as having the largest watershed of any heartland river." *Id*. at 72.

5

basin . . . and that dairy waste application fields and municipal wastewater treatment plants are the major controllable sources of phosphorus," the Commission developed two Total Maximum Daily Loads (TMDLs) for phosphorus in the North Bosque River watershed.[3] One of the goals of the TMDLs was to achieve a 50% reduction in the annual average loading of soluble phosphorus.

Also in 2001, the legislature amended chapter 26 of the water code by adding subchapter L, titled "Protection of Certain Watersheds," to address dairy CAFOs in certain watersheds. *See generally* Tex. Water Code Ann. §§ 26.501-.504 (West 2008) ("subchapter L"). Chapter 26, titled "Water Quality Control," states the policy of the State to maintain water quality:

> It is the policy of this state and the purpose of this subchapter to maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, and the operation of existing industries, taking into consideration the economic development of the state; to encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state; and to require the use of all reasonable methods to implement this policy.

*Id*. § 26.003 (West 2008). And chapter 26 designates the Commission as the primary agency responsible for administering chapter 26, including establishing water quality levels:

> Except as otherwise specifically provided, the commission shall administer the provisions of this chapter and shall establish the level of quality to be maintained in, and shall control the quality of, the water in this state as provided by this chapter. Waste discharges or impending waste discharges covered by the provisions of this

---

[3] According to the Commission, a TMDL is a "quantitative plan that determines the amount of a particular pollutant that a water body can receive and still meet its applicable water quality standards." The TMDL program addresses "impaired or threatened" water bodies in the state and the program's primary objective is "to restore and maintain the beneficial uses (such as drinking water, recreation, support of aquatic life, or fishing) of impaired or threatened water bodies."

chapter are subject to reasonable rules or orders adopted or issued by the commission in the public interest. The commission has the powers and duties specifically prescribed by this chapter and all other powers necessary or convenient to carry out its responsibilities.

*Id*. § 26.011 (West 2008); *see also id*. §§ 26.012-.0136 (West 2008). Subchapter L then bespeaks the legislative's specific directive to the Commission, as the primary agency for administering chapter 26 and establishing water quality levels, concerning the balance between the economic interests of dairy CAFOs and water quality in the designated watersheds.

Subchapter L "applies only to a feeding operation confining cattle that have been or may be used for dairy purposes, or otherwise associated with a dairy, including cows, calves, and bulls, in a major sole source impairment zone" and defines "major sole source impairment zone" (MSSIZ). *Id*. § 26.502.[4] At the time subchapter L was enacted, the North Bosque River watershed

---

[4] Section 26.502 defines a "major sole source impairment zone":

. . . a watershed that contains a reservoir:

(1)    that is used by a municipality as a sole source of drinking water supply for a population, inside and outside of its municipal boundaries, of more than 140,000; and

(2)    at least half of the water flowing into which is from a source that, on the effective date of this subchapter, is on the list of impaired state waters adopted by the commission as required by 33 U.S.C. Section 1313(d), as amended:

        (A)    at least in part because of concerns regarding pathogens and phosphorus; and

        (B)    for which the commission, at some time, has prepared and submitted a total maximum daily load standard.

7

was the only watershed that fell within the definition of a MSSIZ.[5]  Among the statutory changes, subchapter L only allows individual—not general—permits in the watershed for the "construction or operation of a new concentrated animal feeding operation, or an increase in the animals confined under an existing operation." *See id*. § 26.503(a).[6]

By requiring individual permits in the North Bosque River watershed, the legislature opted to provide "meaningful opportunity" for persons who may be affected "to voice their concerns" and active participation in the permitting process, including through contested case hearings, before a new permit is issued in the watershed.[7]  *See* Tex. Water Code Ann. §§ 5.115(b) (at the time an application for permit is administratively complete, "commission shall give notice of the application to any person who may be affected by the granting of the permit or license"); 26.503(a) (individual permit required); *Chocolate Bayou Water Co. & Sand Supply v. Texas Natural Res. Conservation Comm'n*, 124 S.W.3d 844, 850 (Tex. App.—Austin 2003, pet. denied) (affording public notice in Commission water permit application context "affords individuals who may be affected by the grant or denial of the permit a meaningful opportunity to voice their concerns and

Tex. Water Code Ann. § 26.502 (West 2008).

[5] The Commission states in its brief:  "The North Bosque River-Lake Waco system is the only impairment zone."

[6] O-Kee Dairy's "major" amendment sought to increase its maximum herd to 999 cows, the cut-off number for a "Medium CAFO," as compared to a "Large CAFO."  *See* 30 Tex. Admin. Code § 321.32(13) (2010) (Commission on Environmental Quality, Definitions) ("small CAFO," "medium CAFO," and "large CAFO" defined by reference to number of animals).

[7] The record includes a copy of the "Legislative Wrapup" that was posted on the Commission's website in the summer of 2001.  The wrapup states that, in enacting subchapter L, the legislature entered "a hotly disputed issue over water quality in the North Bosque River" and that "lawmakers struck a compromise between the city of Waco and area dairy operations."

8

participate in the permitting process by requesting a contested-case hearing on the permit application") (citing *United Copper Indus., Inc. v. Grissom*, 17 S.W.3d 797, 802 (Tex. App.—Austin 2000, pet. dism'd as moot)); *see also* Tex. Gov't Code Ann. § 2001.051 (West 2008).

Because O-Kee Dairy is located on segment 1226 of the North Bosque River in the North Bosque River watershed, it is subject to the requirements of subchapter L and corresponding Commission rules, including additional permitting requirements and stricter waste handling practices. *See* Tex. Water Code Ann. §§ 26.503-.504; *see also* 30 Tex. Admin. Code §§ 321.42 (2010) (Commission on Environmental Quality, Requirements Applicable to the Major Sole-Source Impairment Zone). With this context, I turn to the parties' dispute.

### *The City's Request for a Contested Case Hearing*

The City requested a contested case hearing on O-Kee Dairy's CAFO permit application on the City's own behalf and as *parens patriae* on behalf of its citizens. To support its request, it submitted written evidence, including affidavits from Bruce L. Wiland, P.E., and Richard B. Garrett, P.E., as well as scientific studies, reports and articles. Wiland averred in relevant part:

> I have been retained by the City of Waco as a consulting expert in the field of water quality analysis, including assessment of the impacts upon Lake Waco of waste and wastewater discharges and runoff from dairy concentrated animal feeding operations ("CAFOs") in the watershed of the North Bosque River. . . .
>
> Based upon my own professional experience, my review of the referenced studies and others performed by other experts, my review of the ENRS lake study summary report, I have the following opinions:

9

- The North Bosque River contributes approximately 64% of the total flow to Lake Waco.

- The North Bosque River contributes more than 72% of the total phosphorus loading to Lake Waco.

- Dairy operations in the watershed of the North Bosque River contribute at least 30 to 40% of the total phosphorous load to Lake Waco.

- Most of the phosphorus loading to Lake Waco from dairy CAFOs in the North Bosque River watershed occurs in periods of heavy rainstorms, when the travel time from the runoff from dairy waste application fields into the river and downstream to Lake Waco is short (typically less than 5 days).

- Such rainstorm events carry phosphorus and bacteria from reaches of the North Bosque River watershed as distant from Lake Waco as is the O-Kee Dairy.

- The primary cause of heavy algal biomass in Lake Waco is the phosphorus that is introduced into the Lake from runoff, particularly from dairy CAFO operations in the upper North Bosque River watershed.

- Source tracking studies indicate that dairy CAFO operations in the North Bosque River watershed are a source of Enterococcus and e-coli, which can possibly be accompanied by cryptosporidium, giardia, and other pathogens, entering Lake Waco. . . .

Based on his knowledge of "the processes by which the runoff and discharges of pollutants from dairy CAFOs in the North Bosque River watershed are adversely impacting Lake Waco" and his "review of the O-Kee Dairy draft permit, 'Fact Sheet,' application, public comments, and the Executive Director's Response to Comments," he opined to the adverse affects on the City and Lake Waco if the draft permit were approved. Wiland concluded the distance from the dairy to Lake Waco did not diminish the adverse effects:

10

The distance of O-Kee dairy from Lake Waco does not eliminate these adverse effects because the primary mechanism for transport of these pollutants to Lake Waco is the very heavy rainstorms that occur in the North Bosque River watershed, and that wash the phosphorus and bacteria off the fields on which dairy waste and wastewater are applied, and that can transport these pollutants to Lake Waco in a matter of 3 to 5 days.

Garrett, who was currently and had been the City's Municipal Services Director of the Water Utility, averred in relevant part:

All adjudicated and permitted rights to the water impounded in Lake Waco are owned by the City for public water supply, irrigation, recreation, and other municipal uses. The City is authorized to divert 78,970 acre-feet per year for municipal use, including consumption by over 160,000 of its citizens and the citizens of other smaller communities in the area. Ten of thousands of citizens of Waco fish, swim, sail, ski, and engage in other water recreation in and on Lake Waco every year. . . .

As shown on the two attached maps, of the five tributaries that flow into Lake Waco, the largest by far is the North Bosque River, which contributes some 65% of the total inflow into Lake Waco. The North Bosque River comprises 74% of the drainage area to Lake Waco, . . .

Lake Waco is the sole source of supply of the public water supply system of the City of Waco, exclusive of emergency water connections. It is the only surface water source of the drinking water that the City treats and distributes to its 113,000 citizens and to approximately 45,000 residents of several small neighboring municipalities. Lake Waco has been designated by [Commission] rules for use as a public water supply.

Garrett also averred concerning (i) studies that show "runoff from dairy-related waste application fields" at CAFO dairies as "the primary contributor of soluble phosphorus into both the North Bosque River and Lake Waco"; (ii) the "very considerable amount of time, money, and other resources" that the City has incurred and continues to incur "to protect its water supply in Lake Waco

11

from harm associated with animal waste"; and (iii) the adverse affect that the proposed permit would have on the "health and welfare" of the citizens of the City.

***Review of the Commission's Denial of the City's Request***

The Commission states in its order denying the City's request for a contested case hearing that it considered the responses to the hearing request filed by the executive director,[8] the Office of Public Interest Counsel,[9] and the applicant, the City's reply to the responses, and all timely public comment and that it adopted the executive director's response to public comment. The Commission does not directly address the City's "affected person" status. The Commission, however, concedes that the City complied with the requirements in subsections (A) through (D) of section 55.211(c)(2) and that its sole basis for denying the City's request for a contested case hearing was the Commission's determination that the City was not an "affected person." *See* 30 Tex. Admin. Code § 55.211(c)(2). The issue then is whether the City was an "affected person" concerning the O-Kee Dairy's CAFO permit application and, therefore, entitled to a contested case hearing. *See id.*

As an initial matter, I question the majority's conclusion that the substantial evidence standard of review applies here. Section 55.211 provides that Commission consideration of a request

---

[8] In the event that the Commission determined that the City was an "affected person," the executive director recommended referring nine issues to SOAH concerning the proposed permit all of which he agreed were disputed, relevant, and material issues raised during the comment period and not withdrawn. *See* 30 Tex. Admin. Code § 55.211(c)(2)(A) (2010) (Commission on Environmental Quality, Commission Action on Requests for Reconsideration and Contested Case Hearing).

[9] The position of the Office of Public Interest Counsel was that the City was an affected person and that the O-Kee Dairy permit application should have been referred for a contested case hearing.

12

for a contested case hearing is "not itself a contested case subject to the APA." 30 Tex. Admin. Code § 55.211; *see* Tex. Gov't Code Ann. § 2001.003(1) (West 2008) (APA defines "contested case" as "a proceeding . . . in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing"). Although the Commission could have referred the issue to SOAH, it chose not to do so and there are no findings of fact or conclusions of law for this Court to review. For substantial evidence review to have any meaning, there must be evidence to review. *See* Tex. Gov't Code Ann. § 2001.174 (West 2008) (substantial evidence standard of review); *see also id*. §§ 2001.060 (record in contested case), .081 (rules of evidence applicable to contested case), .087 (right to cross-examination in contested case); *Steadman v. Securities & Exch. Comm'n*, 450 U.S. 91, 97 n.13 (1981) ("Substantial-evidence review by the Court of Appeals here required a hearing on the record. . . . Otherwise effective review by the Court of Appeals would have been frustrated.") (citation omitted).[10] I further question the majority's reliance on *Collins* concerning the applicable standard of review. *See Collins v. Texas Natural Res.*

_____

[10] Referral to SOAH was created precisely for this type of situation. SOAH was "created to serve as an independent forum for the conduct of adjudicative hearings in the executive branch of state government. The purpose of the office is to separate the adjudicative function from the investigative, prosecutorial, and policymaking functions in the executive branch in relation to hearings that the office is authorized to conduct." Tex. Gov't Code Ann. § 2003.021(a) (West 2008); *see Hawkins v. Community Health Choice, Inc*., 127 S.W.3d 322, 325-26 (Tex. App.—Austin 2004, no pet.) (citing *Flores v. Employees Ret. Sys.*, 74 S.W.3d 532, 540 (Tex. App.—Austin 2002, pet. denied)) (discussion of SOAH's role as a "neutral fact-finder"). SOAH is empowered to determine "'adjudicative facts,' those that answer 'who, what, when, where and how' and are 'roughly the kind of facts that go to a jury in a jury case.'" *Id*. (quoting *Flores*, 74 S.W.3d at 539). "'[G]iven that the resolution of disputed adjudicative facts requires weighing the evidence and making credibility determinations, a neutral decision-maker is crucial to a fair adjudicatory hearing.'" *Id*. (quoting *Flores*, 74 S.W.3d at 540). Had the Commission referred the issue to SOAH, this Court would be able to conduct a meaningful review, in accordance with the statutory and regulatory scheme.

13

*Conversation Comm'n*, 94 S.W.3d 876 (Tex. App.—Austin 2002, no pet.). In contrast with the facts here, in *Collins*, the Commission referred the disputed material fact issue concerning the party seeking "affected person" status to SOAH for determination, the administrative law judge (ALJ) entered findings of fact and conclusions of law, and the Commission adopted the ALJ's findings of fact and conclusions of law. *See id*. at 881. In that context, this Court reviewed the Commission's determination for substantial evidence.

But, even if I were to conclude that the standard of review is one of substantial evidence, at a minimum, I would reverse the trial court and remand to the Commission for referral to SOAH as to whether the City falls within the definition of an "affected person" concerning the O-Kee Dairy CAFO permit application. *See* Tex. Water Code Ann. § 5.115(a); 30 Tex. Admin. Code § 55.211(b)(4). Under the substantial evidence standard of review, a court "may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but: . . . shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." *See* Tex. Gov't Code Ann. § 2001.174(2)(F). "An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n.8 (Tex. 1966)).

14

In considering whether an agency has abused its discretion, a reviewing court must ascertain those factors considered by the agency. *See Gerst*, 411 S.W.2d at 360 n.8; *Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719, 721 (Tex. App.—Austin 1989, no writ). "There must appear a rational connection between the facts and the decision of the agency." *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. App.—Austin 1979, writ ref'd n.r.e.) (citation omitted). "Stated differently, the reviewing court must remand '. . . if it concludes that the agency has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making.'" *Id.*; *see Webworld Mktg. Group, L.L.C. v. Thomas*, 249 S.W.3d 19, 25 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g).

To the extent that the Commission relied upon the executive director's response to the City's request and his analysis of the enumerated factors under section 55.203, the executive director recommended that the Commission "find that Waco is not an affected person in regards to this permit application," primarily based upon the geographic distance between O-Kee Dairy and Lake Waco and his determination that the "cumulative effects" of all dairy CAFO s was not relevant. He stated in his written response to the City's hearing request:

> . . . Waco has water rights in Lake Waco, approximately 89 miles downstream from the dairy to the surface water intake points on the lake. Waco's interest in maintaining water quality in Lake Waco is protected by the rules and regulations covering this permit application and there is also a reasonable relationship between the interest claimed and the activity regulated. However, the distance from the dairy to the City of Waco and Lake Waco weigh heavily against Waco's claim they are affected persons for purposes of this particular permit application. . . .
> Assuming the dairy had a discharge, the facility is approximately 7.2 downstream miles from reaching the North Bosque River, another 75 miles downstream to the point where the North Bosque enters Lake Waco, and another 6.8 miles from that point across the lake to the location of Waco's surface water

intake for their drinking water supply. Waco argues that it should be granted affected person status as long as a facility has the potential to discharge contaminants that reach Lake Waco, regardless of distance. If Waco is affected in this case, any city in Texas can challenge any permit upstream of their drinking water supply, without regard to distance, through the CCH process.

Additionally, a discharge from this dairy is unlikely to impact the health and safety of persons who drink Waco's water or to impact the use of the waters of Lake Waco. At 82 miles upstream of the point where the North Bosque enters Lake Waco the distance is such that if there is a discharge from the facility, assimilation and dilution would occur long before the water reaches Lake Waco. However, even if the discharge could somehow survive that 82 mile trip downstream, it would then mix with Lake Waco water and would have to survive further dilution to travel an additional 6.8 miles across Lake Waco to reach the point where Waco extracts drinking water from the lake. . . . Therefore, Waco's interest is common to members of the general public and does not qualify as a personal justiciable interest.

The executive director conceded that the factor of "whether a reasonable relationship exists between the interest claimed and the activity regulated" weighed in favor of granting the City's request. *See* 30 Tex. Admin. Code § 55.203(c)(3). This conclusion is consistent with the scientific data, subchapter L, and the Commission's adoption of the TMDLs for the North Bosque River watershed, all of which demonstrate the relationship between the interest claimed—the City's interest in Lake Waco's water quality—and the activity regulated—the operations of O-Kee Dairy, a dairy CAFO located upstream.

Concerning "distance restrictions," the executive director's expressed concern that, if the City was an affected person in this case, any Texas city would be entitled to a contested case hearing for any permit located upstream of its water supply source without regard to distance. *See id.* § 55.203(c)(2). To be sure, if it is shown that the distance from a source of pollution to a city's water intake does not eliminate the potential harm to the city's water supply, why should the affected city be denied the opportunity to be heard in accordance with the legislative directive? Further, even

16

if that were the case concerning other cities, their "affected person" status in future cases is not relevant here and, in any event, would require some factual inquiry. *See Starr*, 584 S.W.2d at 356.[11]

To the extent the Commission relied upon the executive director's conclusions concerning the "likely impact" of the permit on the "health and safety" of the City's citizens and the "use of the impacted natural resource" by the City, his conclusions ignore the scientific data. *See* 30 Tex. Admin. Code § 55.203(c)(4), (5). The executive director contended that any rainfall runoff or discharge from the dairy would be diluted because of the distance between the O-Kee Dairy and Lake Waco. In reaching his conclusions, the executive director had to discount the City's "over 200 pages of exhibits documenting the nutrient issue as it applies to the North Bosque River and Lake Waco." The executive director contends that the City's exhibits do not address this particular application:

> None of the documentation submitted by Waco identifies the Applicant by name as a source of nutrients. Waco's issue in this case is not the potential contamination that could be caused by this particular dairy, but the cumulative effects of all CAFO dairy operations in the North Bosque watershed.

The executive director's conclusions simply do not square with the recognition by the Commission and the legislature of scientific studies and reports showing the adverse impact that dairy

---

[11] The regulatory limitations or restrictions that the Commission references in its briefing similarly are not applicable here. *See* 30 Tex. Admin. Code §§ 55.203(c)(2); 321.38(b)(1) (Commission on Environmental Quality, Control Facility Requirements Applicable to CAFOs) (ponds must be at least 500 feet from a public drinking-water-supply well), 321.40(h) (Commission on Environmental Quality, CAFO Land Application Requirements) (crop fields must be surrounded by a vegetated buffer zone of at least 100 feet), 321.43(j) (Commission on Environmental Quality, Air Standard Permit for Animal Feeding Operations (AFOs)) (permanent odor sources must be more than one-fourth or one-half mile from occupied buildings or public parks).

CAFOs have had on Lake Waco. The Commission adopted TDMLs for the watershed, including segment 1226, and the legislature enacted subchapter L to address the adverse impact that dairy CAFOs have had on water quality in the North Bosque River watershed and on Lake Waco. Further, the Commission continues to acknowledge the potential harm to the City from O-Kee Dairy's expanded operation.[12]

Although the executive director also concluded that "Waco has no authority to regulate dairies located outside its boundaries in another county" and "no authority under state law over whether the dairies comply with 30 TAC Chapter 321, subchapter B regulating CAFOs," the City's interest in the water quality of Lake Waco, as its sole source of drinking water, "is one protected by the law under which the application will be considered." *See* 30 Tex. Admin. Code § 55.203(c)(1). A core function of a city is to protect its citizens, including protecting the public drinking water supply. *See* Tex. Health & Safety Code Ann. § 121.003(a) (West 2010) (municipality's authority to "enforce any law that is reasonably necessary to protect the public health"); Tex. Water Code Ann. §§ 26.171-.180 (West 2008) (authority of local governments concerning public water located within their jurisdiction). Further, a city's interest in its sole water supply is distinct from the interest common to members of the general public in that a city is statutorily authorized to "enforce any law that is reasonably necessary to protect the public health." *See* Tex. Health & Safety Code Ann. § 121.003(a); 30 Tex. Admin. Code § 55.203(a), (c)(6).

---

[12] In its brief, the Commission recognizes that the dairy industry as a whole in the watershed has contributed to episodes of taste and odor problems with the City's drinking water by contributing nutrients in the watershed as well as the potential for discharge of phosphorus and rainfall runoff into the North Bosque River.

Upholding the Commission's denial of the City's request for a contested case hearing in the face of its own prior conclusions concerning the impact of dairy CAFOs on the watershed and Lake Waco defeats the legislature's directive to the Commission concerning the balance between economic development and water quality protection. In striking its balance, the legislature has spoken clearly and has opted for public input and proof through contested case hearings when an affected person raises disputed relevant and material issues of fact. This approach allows informed decision-making on the relevant statutory and regulatory requirements and fosters the development of the best possible permit that can be issued. Affording "affected person" status and proceeding with a contested case hearing on disputed relevant and material facts allows the Commission to make its ultimate decision on fully vetted and valid scientific data.

The Commission's decision to deny the City's request for a contested case hearing lacks transparency and substantiation.[13] In his response to the City's request, the executive director acknowledged nine relevant and material issues of fact concerning the ultimate decision of whether or not the Commission should issue the O-Kee Dairy's CAFO permit and recommended

---

[13] The record raises the question of the role individual legislators' pressure played in the Commission's decision to deny the City's request for a hearing. On January 25, 2008, the week before the Commission met to consider the City's request, a state senator faxed a letter to the Commissioners requesting that they deny the City's request for a contested case hearing and allow the executive director to issue the final permit to O-Kee Dairy. It was the senator's position that the City was challenging individual permits as "leverage" and that its real dispute was with the executive director and the Commission concerning the Commission's failure to adopt stricter requirements in its rules in 2004 concerning CAFO dairies. He also expressed concern about the "enormous expense of an administrative trial against the City" that the individual dairy would face should the matter be referred to a contested case hearing, a factor not included in section 55.203. *See* 30 Tex. Admin. Code § 55.203 (West 2010) (Commission on Environmental Quality, Determination of Affected Person); *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (agency decision may not be based upon irrelevant factors).

19

referring those issues to SOAH in the event that the Commission concluded that the City was an "affected person." By denying the City's request then, the commission precluded a meaningful opportunity to adjudicate these disputed substantive issues and the City, attempting to perform its undeniable function of protecting its citizens' sole water supply, was precluded from a "meaningful opportunity" to be heard on these issues. *See Chocolate Bayou Water Co*., 124 S.W.3d at 850.

Considering the documented impaired condition of the North Bosque River watershed and the watershed's location upstream from Lake Waco, as well as the Commission's own scientific data of the past adverse impact that dairy CAFOs in the North Bosque watershed have had on water quality, I would conclude that the Commission did not engage in reasoned decision-making and that the facts are not rationally connected to the Commission's decision. *See Starr*, 584 S.W.2d at 355. The scientific data, as well as the City's expert affidavits, demonstrate the City's "personal justiciable interest related to a legal right" (its water rights concerning Lake Waco), "duty" (its duty to protect its sole water supply), and "economic interest" (its interest in controlling expenses to preserve the water quality of Lake Waco) "affected by the administrative hearing." *See* Tex. Water Code Ann. § 5.115(a). I would conclude that the Commission's decision that the City is not an "affected person" is arbitrary or characterized by abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174(2)(F); *Starr*, 584 S.W.2d at 355. In sum, the Commission's denial of the City's hearing request is antithetical to the text, structure and purpose of the water code.

### *The Majority's Opinion*

The majority concludes that the Commission's determination that the City was not an "affected person" was supported by substantial evidence based upon the Commission's

20

determination that "granting this permit would have an overall beneficial environmental impact and therefore would not adversely affect the City."[14] The majority discusses the substance of required operational changes in the proposed permit, the stricter requirements in the "new" regulations, and the executor director's statement in his response to public comment that the proposed permit should "significantly reduce the potential for pollutants entering receiving waters." By addressing these issues, the executive director—and the majority—have leaped into the deep waters of the merits of the case which cannot be resolved without a hearing.

The majority primarily relies upon *Collins* in reaching its conclusion that substantial evidence supports the Commission's determination not to afford "affected person" status to the City. The issue before this Court in *Collins*, however, is not analogous. In addition to the Commission's adoption of the ALJ's findings of fact and conclusions of law for this Court to review, we decided *Collins* under a prior version of section 5.115. *See* 94 S.W.3d at 881-82.[15] And there were distance limits on a person's standing to contest the issues—primarily noxious odors—there:

---

[14] I disagree with the majority's characterization of the Commission's basis for its decision to deny the City a contested case hearing. The Commission's order is silent concerning the basis for its decision.

[15] Before its amendment in 1999, section 5.115 of the water code provided:

The commission is not required to hold a hearing if the commission determines that the basis of the person's request for a hearing as an affected person is not reasonable or is not supported by competent evidence.

Act of May 28, 1995, 74th Leg., R.S., ch. 882, § 1, 1995 Tex. Gen. Laws 4380, 4381 (Tex. Water Code Ann. § 5.115(a)), since amended by Act of May 30, 1999, 76th Leg., R.S., ch. 1350, § 1, 1999 Tex. Gen. Laws 4570.

21

The map that the ALJ found to be accurate indicates that Collins's property is not adjacent to B&N's property and that his home is approximately 1.3 miles away from the proposed lagoons. Collins predicts that the lagoons will produce "noxious odors." But a concentrated animal feeding operation, such as B&N's farm, qualifies for a standard air permit—issued without the opportunity for a contested case hearing—if its permanent odor sources are at least half a mile from occupied residences and business structures.

*Id*. at 882-83. Finally, the denial of a single farmer's request for a contested case hearing does not equate with a governmental body charged with protecting its citizen's sole water supply. *See also Grissom*, 17 S.W.3d at 803 (Commission erred in denying request for a contested case hearing by a person living within two miles of copper melting furnaces operation based upon health concerns).

An "affected person" serves the role of percolating the material issues concerning the merits of a permit application, enabling the Commission to make an informed decision. Here, it would allow one based on scientific data. The majority's decision affirming the Commission's denial of the City's request for a contested case hearing disrupts the balance between economic development and water quality protection that the legislature struck when it afforded an "affected person" the right to a contested case hearing concerning a CAFO permit upon an appropriate showing.

**CONCLUSION**

The Commission is charged with the stewardship of our rivers, and national water policy only succeeds to the extent each jurisdiction performs its regulatory function.[16] The

---

[16] Texas has 80,000 miles of waterways that meander through the Texas landscape generally flowing into estuaries and supporting reservoirs, wetlands, and terrestrial areas. These important aquatic ecosystems play a major role in protecting water quality for all citizens, preventing erosion,

Commission's arbitrary decision to deny the City "affected person" status operates to stifle the legislative directive, the administrative process, and its regulatory function.[17] Moreover, the City's request for relief is modest, a meaningful hearing on disputed material issues of fact that the executive director agrees are relevant to the permit application. For these reasons, I respectfully dissent.

---

and providing nutrients and habitat for fish and wildlife for this and future generations. "Just as you feel when you look on the river and the sky, so I felt . . . Flow on, river! flow with the flood-tide, and ebb with the ebb-tide! . . . drench with your splendor me, or the men and women generations after me!" Walt Whitman, *Leaves of Grass* (1855). "A whole river is mountain country and hill country and flat country and swamp and delta country, is rock bottom and sand bottom and weed bottom and mud bottom, is blue, green, red, clear, brown, wide, narrow, fast, slow, clean, and filthy water, is all the kinds of trees and grasses and all the breeds of animals and birds and men that pertain and have ever pertained to its changing shores, is a thousand differing and not compatible things in-between that point where enough of the highland drainlets have trickled together to form it, and that wide, flat, probably desolate place where it discharges itself into the salt of the sea . . . . [I]f you are built like me, neither the certainty of change, nor the need for it, nor any wry philosophy will keep you from feeling a certain enraged awe when you hear that a river that you've known always, and that all men of that place have known back into the red dawn of men, will shortly not exist." John Graves, *Goodbye to a River* 4, 8-9 (1959).

[17] I also question the majority's conclusion that the City "received all the process it was due." *See University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995) (citations omitted) ("Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner."). The public meeting that the majority references lasted less than an hour, and there was no substantive discussion of the permit application. The only substantive statements were from a representative for the City who stated that the City stood behind its written response and referred the Commission to those comments. The remaining people to speak at the meeting either expressed their support for the dairy industry generally, noted the delay in the issuance of the permit, and/or their personal opinion that the O-Kee Dairy permit should be issued. According to the City, the City was not allowed to speak at the Commission meeting in January 2008.

23

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Filed:   September 17, 2010